Baldwin, J.
The power of compelling a discovery in an action at law by propounding interrogatories, is derived altogether from our statute, Supp. Rev. Code, ch. 109, § 68, p. 161; and is confined in express terms to such interrogatories as the party would be bound to answer upon a bill of discovery in a Court of chancery. It is by this test, therefore, that the propriety of the interrogatories in the present case must be determined.
It is not the province of equity to do more than justice between parties litigant before it, and it leaves whatever savours of punishment or penal retribution to the rigours of the common law. It therefore not only refuses directly to enforce penalties and forfeitures, but will not for such a purpose exercise its ancillary jurisdiction in aid of a common law forum, and especially when it is called upon to compel a discovery on oath from the party sought to be subjected. In the last respect, indeed, it conforms to the spirit of the common law, which, jealous of the liberty of the citizen, protects him from being made his own accuser, or forced to give evidence against himself.
The rule of equity on this subject, is not confined to cases where the purpose of the suit itself, or of the action to which it is ancillary, is to enforce the penalty or *491 forfeiture ; but extends to those where the discovery itself would expose the party to some other action or suit, or any criminal or penal prosecution tending to the like result. Nor is it material whether the penalty or forfeiture arises out of the common or statute law, or is imposed by some conveyance, devise or contract, giving to the act of the party which he is called upon to discover, the effect of divesting or defeating his title or estate. Thus, for example, it embraces, on the one hand, a bill for discovery of waste committed by a tenant, unless the consequential penalty or forfeiture be waived, or of any matter which would subject the party to the loss of a franchise or office, or of a breach of commercial regulations exposing him to the forfeiture of a ship or cargo ; and so, on the other hand, it reaches the case of the assignment of a lease by a lessee without license, or of a marriage without consent of a parent or other person designated, by which there is to be a forfeiture of a term, estate, portion or jointure. Some nice distinctions, rather questionable in principle, and founded upon a difference in phraseology, have been held between conditions of forfeiture in conveyances or devises, and conditional limitations affecting the duration of the estate ; and between a forfeiture and a disability to take or hold. See Story’s Eq. Plead. § 579, note, and § 586, note. These have been adverted to in the argument, but need not be further noticed here: There can he no stronger case than the present for the application of the rule of equity, that a party cannot be compelled to make a discovery, the tendency of which is to subject him to a penalty or forfeiture.
The question does not arise upon the provisions or limitations of a deed or will, but upon a highly penal statute, applicable to a whole class of persons, having a limited estate, and doing a wrongful act to the prejudice of others interested in the subject. The wrongdoer, by express enactment forfeits his title, and more *492 over is made liable to the recovery of the full value of the property. The very object of this action is to enforce the forfeiture, and the instrument to accomplish it is the discovery, which at the same time exposes the Party to another action for the recovery of the penalty. If the principle of equity does not reach such a case, it must be because the forfeiture and penalty do not enure to the Commonwealth, but to the party aggrieved ,• a distinction which has not the slightest countenance either from reason or authority.
The whole drift of the interrogatories, it will be seen, was to obtain from the appellants a discovery that they had violated the statute by removing beyond the limits of the Commonwealth the slave in question. It is in vain to urge that the objection comes too late, after the interrogatories had been answered, and that instead of being taken to the admission of the answers in evidence, it ought to have been made to the propounding of the interrogatories. It is true that when a discovery is sought by a bill in chancery, for the purpose of being used in an action at law, any objection to the discovery must be made by demurrer, plea, or answer, to the bill; and that if the defendant submits to make the discovery, or objects, and his objection is overruled, he cannot afterwards exclude the evidence on the common law trial. The reason is, that it is not competent for the Common Law court to reject the admission of the party voluntarily made, or to review the decision of the Chancery court compelling the discovery. If that decision be wrong, it can only be reversed in an appellate forum. But in regard to interrogatories propounded under the authority of the statute in a common law action, there is nothing to which the defendant can plead or demur, and nothing which he can answer but the interrogatories themselves. This he must do when required by the order of Court. He cannot appeal from that order, but must await the final judgment in the *493 cause ; and an appeal from that judgment brings up the question, whether the Court erred in approving the interrogatories, and requiring them to be answered. I cannot doubt that the interlocutory order was erroneous ; and the bill of exceptions to the admission of the answers in evidence serves to shew that it was prejudicial to the appellants. If the answers to the interrogatories had been rejected or not offered on the trial, then the appellants would have had no sufficient reason to complain in an appellate forum of the ineffectual order. But the error was not so cured at the trial, but persisted in by suffering the answers to the interrogatories to be read to the jury.
There is no foundation for the argument that the discovery so obtained and used, was not prejudicial to the appellants. It is urged that this appears from their bill of exceptions to the refusal of the Court to grant a new trial, which it is said serves to shew that there was sufficient evidence before the jury to warrant the verdict, independently of the answers to the interrogatories. If this were so, it would avail the appellees nothing, for the sufficiency of the evidence was exclusively a matter for the decision of the jury; and this Court cannot undertake to say what verdict they would have rendered, if the improper evidence had been excluded. There are, doubtless, cases in which a judgment ought not to be reversed for an error of the Court in excluding or admitting evidence, or giving an improper or refusing a proper instruction to the jury, where it appears that such error could not possibly have prejudiced the party: But that can never be predicated of a case depending, as this did, upon parol testimony, the weight and credit of which must of course be determined by the jury. The question is altogether different upon a motion for a new trial, which is addressed to the sound discretion of the Court, and will not be granted because of errors *494 committed by the Court in the progress of the trial, if the verdict be right upon the merits of the case.
In the next place, the first instruction moved by the appellants and refused by the Court, presents the question, whether the 48th section of the act concerning slaves, &c., 1 Rev. Code, ch. 111, p. 431, under which the forfeiture is claimed, applies to a bona fide purchaser for a valuable consideration, of the absolute property, who removes the slave from the Commonwealth, without notice of the limited estate of his vendor. The act provides that “ if any person or persons possessed of a life estate in any slave or slaves, shall remove, or voluntarily permit to be removed, out of the Commonwealth, such slave or slaves, or any of their increase, without the consent of him or her in reversion or remainder, such person or persons shall forfeit every such slave or slaves so removed, and the full value thereof, unto the person or persons that shall have the reversion or remainder thereof.”
It will be seen that under this act the forfeiture and the penalty are incurred by the actual removal of the slaves, and by the same person; the removal must be by the tenant for life himself or by his voluntary permission : And no other person concerned in the removal is exposed to the denunciation of the statute. In effect, the statute is directed against a removal by the tenant for life, accomplished by him or by his authority; and “ the voluntary permission” is introduced into the enactment to prevent the misapprehension that the removal must be his own personal act, to the exclusion of the agency of another. The “voluntary permission” imports a knowing and wilful procurement of, or assent to, the actual removal, and not a failure to prevent it through ignorance or negligence. This, I think, is the plain meaning of the statute, and that a different construction cannot be given to it, without embracing in *495 nocent acts and innocent persons not contemplated by the statute.
It is obvious that this enactment is not intended to prevent the alienation of a life estate in slaves, nor to subject the tenant for life to a forfeiture or penalty for the conduct of his alienee, in removing the slaves, or permitting them to he removed, out of the Commonwealth. Indeed, the terms of the act are directed against the owner of the life estate during the continuance of his ownership, and can with no propriety be applied to one who has parted from his ownership. He cannot be said to forfeit what he no longer holds or possesses, nor has he authority either to license or to prevent the removal of that which has become the property of another. He ceases to be tenant for life when he conveys his title and possession to a purchaser, who thereupon becomes possessed of the life estate, and liable himself for his removal, or permission of removal, by another. A different construction of the law, would in effect prohibit the alienation of a life estate in slaves, for what discreet man would, part from his title and possession, if he were to be held liable, until the remainder or reversion took effect, for the act of any future alienee, however remote, in removing the slaves out of the Commonwealth. A tenant for life, therefore, whether original or derivative, who sells his limited estate to another, incurs no penalty or forfeiture by the act of his alienee in removing the slaves from the Commonwealth.
On the other hand, a bona fide purchaser of the absolute property, who removes the slaves under the belief that his estate is unlimited, is equally exempt from the penalty and forfeiture. I think it clear that the statute contemplates a wrongful, aud not an innocent act. Both its terms and its spirit are applicable to the original tenant for life, or one acquiring his title by the purchase of his limited interest. They are presumed to *496 know the character of their title, and the relation in which they stand to those in remainder or reversion. But how can this be said of the purchaser of the abso- . lute property from the apparent owner. The presumpt^on *s t^iat *s without information of the limited interest of his vendor: and he is often without the means of acquiring it; for slaves, like other chattels, may be sold by .parol and pass by delivery. And when he is made the victim of his vendor’s fraud in selling him a defective title, whereby his ownership becomes defeated at the expiration of the life estate, what propriety can there be in subjecting him, moreover, to a double punishment for removing the property from the Commonwealth, without notice of the defect in his title. It would be unreasonable, it seems to me, to attribute to the Legislature so unjust and cruel an intent.
In the language of Lord Coke, “ Acts of parliament are to be so construed as no man that is innocent, or free from injury or wrong, be by a literal construction, punished or endamaged.” 1 Thos. Co. Litt. 28.
It is argued, however, that though the innocent purchaser may not incur himself, either the penalty or the forfeiture, by his removal of the slaves from the Commonwealth ; yet that both would be thereby incurred by his fraudulent vendor, because the sale by the latter of the absolute property, was authority to exercise any act of ownership, and consequently a voluntary permission to remove them from the Commonwealth. But this argument proves too much. It assumes that the subsequent removal is under the authority of the absolute sale, and affirms that it throws upon the vendor both the penalty and forfeiture, and thereby defeats the title of the vendee. The consequence would be, that though the vendee, after his purchase should acquire full knowledge that his vendor was only tenant for life, and should, notwithstanding, remove the slaves from the Commonwealth, he would incur neither the penalty *497 uor the forfeiture, which would both be thrown upon the vendor; (for there cannot be two penalties and two forfeitures for the same act of removal;) and this, though the vendor may in fact have been ignorant of the defect of his title at the time of the sale, and discovering it afterwards, give timely notice thereof to the vendee, and endeavour to rescind the contract, before the removal of the slaves. A construction of the statute cannot be correct, which, while it inflicts a penalty upon an innocent vendor, absolves therefrom a guilty vendee.
The truth is, that the statute is directed against a wrongful removal, and not against a wrongful alienation, which was not in the legislative mind, or it would have been directly provided for, instead of being left to mere implication. A wrongful alienation confers no more authority to remove the slaves from the Commonwealth than a rightful alienation. It passes to the vendee, as effectually as a rightful alienation, the title of the vendor, and none other; and in nowise divests that of the remainderman or reversioner. It was not the design of the Legislature, to adopt in regard to slaves, the common law doctrine of forfeiture by wrongful alienations of tenants for life ; which sprang from principles of the feudal law, and was applicable only to conveyances of lands by feoffment, fine or recovery, which had the effect of discontinuing the estate of him in remainder or reversion; and not to conveyances by bargain and sale, lease and release, and the like, which passed only such estate as the grantor might lawfully convey.
The only plausible argument, it seems to me, for treating the wrongful alienation of the tenant for life of slaves as a forfeiture, is the supposition that it falls within the mischief of the statute, by the power which it gives to the alienee of removing the slaves from the Commonwealth. But in fact it gives him no more power in this respect than a rightful alienation, inas *498 much as the possession and the title conferred are in both cases precisely the same. The most that can be said with truth is, that if the vendee were not deceived by the vendor’s concealment from him of the defect of title, he would not have purchased the slaves, and consequently could not have conceived and accomplished the desire of removing them from the Commonwealth: But such remote, indirect and uncertain consequences, are surely not within the meaning of the statute.
The decisive answer, however, to all such arguments, founded upon inconvenience and mischief, is that the Legislature was not legislating at all upon the subject of wrongful alienations of slaves, but upon the subject of wrongful removals of them from the Commonwealth, directly or indirectly, by the then tenant for life, whether original or derivative. And hence we find, as already remarked, that the statute gives but one penalty and one forfeiture; that both are incurred by the same act; and by one and the same person, with one single exception. If a tenant for life of slaves, whether original or derivative, aliens his estate to another upon a collusion between them to remove the slaves from the Commonwealth, which purpose is accomplished; the sale being valid between the parties, the remainderman or reversioner may elect to treat it as such, and proceed against the purchaser, for both the penalty and the forfeiture. Or the sale being fraudulent and void as to the remainderman or reversioner, he may treat it as nugatory, and the removal of the slaves as the act of the vendor, against whom he may elect to proceed as well for the forfeiture as the penalty.
Whenever the Legislature shall think proper to restrain by penalties and forfeitures, the alienation, whether rightful or wrongful, of estates for life in slaves, it will be our duty to give effect to their enactments; and we may confide in then wisdom for such provisions as will punish the guilty and exempt the innocent.
*499 The notice contemplated by the instruction asked and required by the nature of the case, is actual notice. The registry of title stands in place of actual notice in controversies concerning the rights of property; but not where the consequence is to inflict upon a purchaser a forfeiture or penalty. There the purchaser must have actual notice itself, such as gives him information of the fact, and thereby imputes to him a wrongful act.
It remains to be considered, whether the appellants are tenants for life, and the appellees remaindermen or reversioners, within the meaning of the statute. The terms, it will be seen, employed in the statute to denote the respective and relative interests in the subject of the enactment, are such as when applied to real property, have a definite and precise signification. They would indicate a particular estate for life in possession, with a vested remainder in fee expectant upon it, and of course passing from the grantor at the same time; or a particular estate for life in possession, with a reversion in fee expectant upon it, and of course ungranted and continuing in the grantor. They would in nowise express an estate in futuro, which cannot pass by conveyance at common law, and which, when created by force of our statute regulating conveyances, 1 Rev. Code, ch. 99, § 28, p. 369, or of a deed deriving its effect from the statute of uses, is the entire estate passing from the grantor and vesting in the grantee, at a future period, and which, until then, continues in the grantor undivided. The principle is of course the same in this respect whether the estate be created by deed or by will: and where there is an executory devise by will, and the freehold is not in the meantime disposed of, it descends, however brief the period, together with the profits, to the testator’s heir at law. 6 Cruise’s Dig. 535, 536. In such an estate, there is no separation of it into parts: it embraces no remainder, nor reversion, nor particular estate: and when the period for its inception occurs, *500 the whole estate is then, and not before, divested from the grantor and vested in the grantee. When, therefore, the period for the vesting of the future estate, happens to be the death of the grantor, that circumstance does not constitute him a tenant for life, nor the grantee a remainderman or reversioner.
The terms of description found in the statute, having thus when applied to real estate, a definite and precise meaning, must, when adopted and employed by the Legislature in relation to slaves, be understood in the like sense for the purpose of expressing the like quantities of interest, with the like mode of creation, and the like relation, dependence and succession between them. And this is the more clear, when we look to the origin and progress in our legislation of the enactment in question.
Our first statutory provision on the subject, was by the 11th section of the act of 1705, declaring slaves to be real estate. 3 Hen. St. 335. It applied only to slaves of which a widow was seized as of the dower of her husband, and subjected her to a forfeiture of her whole dower in her husband’s estate to the reversioner. By the act of 1727, 4 Hen. St. 222, important changes were made in slave property, by which it was made in most respects, and indeed in nearly all respects, except descents, personal estate. Lee, ex’or of Daniel, v. Cook, 1 Wash. 306; Walden’s ex'or v. Payne, 2 Wash. 1. But it made no alteration in the provisions of the act of 1705, in relation to the removal of dower slaves. In the year 1748, an act was passed for the repeal of the acts of 1705 and 1727, and declaring slaves to be thereafter personal estate, 5 Hen. St. 432: and yet, by another act passed at the same time for the distribution of intestates’ estates, the provisions of the act of 1705, in relation to the removal of dower slaves from the Commonwealth, were re-enacted nearly totidem verbis, substituting the word possessed for the word seized. 5 *501 Hen. St. 446. These two acts were repealed by royal proclamation in 1751, 6 Hen. St. 215, (and see the remonstrance to the Crown, 5 Hen. St. 432;) and so the acts of 1705 and 1727, were reinstated. By the act of 1785, 12 Hen. St. 145, the provisions of the act of 1748, in regard to the removal of dower slaves from the Commonwealth, were re-enacted, without alteration. And by the act of 1792, 1 St. Large N. S. 128, (which declared slaves personal estate,) all persons possessed of a life estate in slaves were embraced, the pecuniary penalty was added to the forfeiture, and the latter confined to the slaves removed, so as to make the law stand as above quoted from the revisal of 1819, with the addition in the last of the word “remainder,” where it occurs. See 1 Rev. Code 432, and Mr. Leigh’s note there.
It is not, however, by this statute that its descriptive terms have been first borrowed from the law of real property and applied to personals. The ancient common law, it is true, allowed no future property to take place in expectancy in goods and chattels. But that rule has long been exploded, and remainders and reversions of personal property expectant upon estates for life, permitted to arise from the provisions of last wills and testaments: and such limitations are equally recognized by the Courts of law and equity. Such an estate in remainder may also be created by deed, 1 Chitt. Bl. B. 2, p. 398; 2 Kent’s Comm. 285; Betty v. Moore, 1 Dana’s R. 235: Powal v. Brown, Bailey’s (S. C.) R. 100; and in reversion, may result from a gift thereby for life only : and these are recognized in equity, which will give its aid when requisite for the preservation of the property to the remainderman or reversioner. And in giving such aid, the Court of equity treats the title in remainder or reversion as good at law; for it only requires an inventory to be signed by the tenant for life, expressing the personal chattels to be in his custody as *502 given to him for life, and that afterwards they are to be delivered and remain for the use and benefit of the remainderman or reversioner. Slanning v. Style, 3 P. Wms. 334; 2 Wills. Ex’ors 859. Nor will security be required unless a case of danger be shewn. It has been questioned whether Courts of law will recognize such limitations of chattels personal by deed. Williams’ Pers. Prop. 186-7-8. But this, it seems to me, is an unreasonable subtlety, and has never been sanctioned in Virginia. There is no reason for a distinction at law in this respect between the case of a deed and a will. See Bishop’s ex’or v. Bishop, 2 Leigh 484.
The enactment we are considering, recognizes the legal title both of the tenant for life and the remainder-man or reversioner, and the forfeiture which it imposes, is of the whole interest of the former, so as to invest the remainderman or reversioner with a complete title to the subject. No one supposes that the statute contemplates a title acquired by will only, to the exclusion of one conferred by deed, and such an idea would be fatal in this action to the pretensions of the appellees.
It is true, as a future estate in lands may be created by executory devise, without any precedent particular estate, so it may be in chattels personal by executory bequest. And so by deed, an estate of freehold or inheritance may be made to commence in futuro by deed, in like manner as by will. 1 Rev. Code, ch. 99, § 28, p. 369. Whether a gift of chattels personal by deed, may in general be made to take effect in futuro, is a question which need not be considered here. That there may be such a gift of slaves by deed duly recorded, seems to be recognized by our statute law, 1 Rev. Code, ch. 111, § 51, p. 432; and was assumed and acted upon by this Court in Patterson v. Franklin, 7 Leigh 590. The remarks, however, already made will serve to shew, that such an estate is quite different from that of a gift of slaves to one for life, with remainder *503 or reversion to another. And the distinction was taken by Judge Brooke, in delivering the opinion of the Court in Patterson v. Franklin, in which it was held that a gift of slaves from a father to his son, from and after the death of the grantor, by a deed silent as to the increase, did not carry the increase bom during the life of the father; though it was conceded that in the case of a gift by deed of slaves to one for life, with remainder to another, the increase bom during the life of the particular tenant would pass at his death, as a part of the estate, to the remainderman. Indeed, that principle had already been held in regard to a will in Ellison v. Woody, 6 Munf. 368. And it will be seen that the enactment in question assumes, as a matter of course, that the increase bom during the tenancy for life, passes at its determination to the remainderman or reversioner, which shews that the Legislature had not in contemplation an estate in futuro.
There is nothing, it seems to me, in the statute to indicate a legislative intent beyond the legal signification of the descriptive terms employed. The terms “ tenant for life,” “ remainder,” and “ reversion,” express ideas well and clearly understood in our system of laws, and they mean nothing more. It is an old and familiar rule, that penal laws are to be construed strictly; not so strictly, it is true, as to defeat the legislative will; but that will is to be ascertained from the language used to express it, and in the sense, whether legal or popular, in which the words were designed to be understood. And we are not at liberty, in expounding such a law, to extend it further than the expressed intent, upon the supposition of a like mischief with that against which the penalty or forfeiture is denounced. Such a latitude of judicial discretion would be perilous to the citizen, and tend to invasions of the legislative province; and so to render penal statutes snares instead of guides.
*504 In regard to the statute in qüestion, it may readily be conceived that the legislative policy did not embrace estates in futuro ; the grantor retaining the possession and control of the property, which, without express notice of the gift, might readily be referred by persons dealing with him to his original and absolute title.
It follows that the appellees have shewn no title by forfeiture to the slave in question; and they can derive none from the deed under which they claim until the death of their grantor.
My opinion is, that the Circuit court .erred in making the order requiring the interrogatories filed by the appellees, to be answered by the appellants; and in permitting the answers of the appellants to those interrogatories, to be read in evidence to the jury; and also in refusing to give the first instruction moved by the appellants; and moreover, in overruling the motion of the appellants for a new trial, inasmuch as the appellees had shewn no title which could maintain their action. And these results of my views of the case, render it unnecessary for me to consider the other points discussed at the bar.
Allen, J.
The 48th section of the act 1 Rev. Code 431, provides, that if any person possessed of a life estate in any slave or slaves, shall remove or voluntarily permit to be removed out of this Commonwealth, such slave or slaves, or any of their increase, without the consent of him or her in reversion or remainder, such person or persons shall forfeit every such slave so removed, and the full value thereof, to the person that shall have the reversion or remainder thereof. In this case the plaintiffs instituted an action to recover a slave, to which they alleged they were entitled in remainder. The slave had been conveyed to them by their father by a deed giving them the slave at the grantor’s death. The grantor afterwards sold his interest or life estate to *505 Stephen Terry, who subsequently, as is alleged, sold the slave absolutely to the defendants, who removed him from the Commonwealth, supposing at the time of their purchase and removal, that they had a complete title. On the trial, the defendants moved the Court to instruct the jury, that if they believed the facts to be as above stated, they were not liable to the forfeiture and penalties imposed by the law. The Court refused to give the instruction; and as I think properly refused. The act, it is true, inflicts a forfeiture and imposes a heavy penalty; and it would be improper, in construing such a law, to enlarge its operation so as to embrace cases which the Legislature did not plainly intend to include. But here the plain meaning of the words embrace the person possessing a life estate. The law makes no reference to the knowledge or belief of the party as to the extent of his interest; nor does it impose upon the reversioner or remainderman the burthen of proving such knowledge or belief. His case is made out by establishing two things, his title as remainder-man or reversioner, and the removal out of the Commonwealth by the possessor of the life estate, or by his voluntary permission. He is not required to bring home to such possessor of the life estate notice or knowledge of his title. The law presumes every man to be acquainted with the state of his own title. The bill of sale, though absolute on its face, was not void because it purports to convey a greater interest than the grantor owned. It operated to vest the grantee with such title as the grantor could part with, and made him the owner of a life estate. If he was ignorant of the extent of his vendor’s interest that was the result of his own negligence; it was his duty to have made all necessary enquiries. It would be difficult to give any effect to the statute if any other construction should be adopted. The terms of a deed or will may be ambiguous ; the alienee or legatee may believe, and be so *506 advised, that he was the absolute owner, and under that impression have removed the slave, but could he rely upon the absence of an intentional wrong as a defence to an action against him under this section ? And k°w on suc^ a trial is the fact of ignorance to be established ? The defendant cannot prove a negative ; and if proof is required of the plaintiff, of actual notice, a new term is imposed in addition to the requisitions of the act; and the principle that every man is presumed to be acquainted with the nature of his own title is violated. To confine the operation of the statute to the original life tenant, or such alienee as can be proved to have notice of the reversion or remainder, would defeat the obvious policy of the law, and in effect repeal the act. The life tenant would in every instance, instead of encountering the risk of a forfeiture, sell the slave absolutely to some innocent purchaser, who could then remove him from the Commonwealth; and the reversioner or remainderman would be without remedy. The clause providing against the voluntary permission to remove was, I think, intended for the case in which the removal was not the personal act of the party, but was done by some agent or another acting for and by authority of the life tenant. The mere sale of the entire interest could not be deemed such voluntary permission to remove by the vendee or any subsequent possessor; and until actual removal no forfeiture would be incurred. So under this construction no forfeiture could be incurred, not by the life tenant, for he did not remove either personally or by his agent, nor by the alienee, for he was ignorant of the limited nature of his interest.
After the refusal of the Court to give the instruction asked for, the defendants moved the Court to instruct the jury, that although the plaintiffs might be entitled to recover the slave, they were not entitled to recover his hires; which instruction was also refused; and the *507 jury were instructed, that if they believed the facts set forth, the plaintiffs were entitled to the hires from the time the slave was removed. In this, I think, there was no error. The action was brought to recover the slave. By the removal the interest of the tenant for life ceased. His title terminated, and the title of the remainderman accrued; it vested in consequence of an act which forfeited the estate of the life tenant, and the remainderman takes the whole interest as fully as if his right to immediate possession had resulted from the death of the tenant for life. Being thus entitled to the subject, his right to the hires thereafter follows as an incident. I think, therefore, there was no error in refusing the instructions asked for by the defendants.
After the verdict, a motion was made for a new trial, which being overruled, an exception was taken, and all the facts proved being certified, the question is presented whether the plaintiffs have shewn themselves to be entitled to an estate in remainder within the terms of the statute. Where words used in a statute have a certain and definite legal signification, it is to be presumed they were used in such sense by the Legislature, unless the contrary plainly appears. An estate in remainder, we are informed by the elementary writers, is an estate to take effect and be enjoyed after another estate is determined ; that the remainder is a relative expression, and implies that some part of the thing is previously disposed of; and that therefore an estate created to commence at a distant period of time, without an intervening estate, is not properly a remainder; it is the whole of the gift and not a residuary part. In the case under consideration, if a remainder was created, it would be a vested remainder; and confer on the grantee an estate in the subject; a present fixed right of future enjoyment; the interest vesting at the time of the grant. As a consequence of such a fixed right and vested interest, the increase of the slave, if a female, during the *508 particular estate would go with the estate or subject, to the remainderman ; and this in virtue of his estate or interest in the subject, and not from any operative words in the deed. For by granting a present estate in possession in the whole subject, though not to take effect in enjoyment until a future period, when the period arrives, the whole subject, with its natural increase, passes to the remainderman. It was therefore said by this Court, in the case of Patterson v. Franklin, 7 Leigh 590, that the rule of the civil law, that partus sequitur ventrem applies (where nothing is said of increase in the will or deed,) to the case where the grant or devise is a life estate to one, remainder over to another. In that case the deed granted the slaves at the death of the grantor and wife, but was silent as to increase ; and the Court held that though the grant was irrevocable by the grantor, the grantee took nothing until the death of the grantor and wife. This could not have been if the deed had created an estate in remainder, for then the grantee would have taken the increase as an incident to his estate, notwithstanding nothing was said of increase in the deed. In this case the increase would have passed, but not in consequence of the estate created, but of the operative words of the deed. The case of Patterson v. Franklin, I consider an express authority that such a grant does not create a remainder in the legal sense of the word, and if nothing else appeared, we must presume that such was the sense in which the Legislature used it. The law, however, on its face indicates the meaning attached to the term by the law maker. It provides for the removal of the slaves or any of their increase, and forfeits the slave so removed to the remainderman. But under such a grant as this, if silent as to increase, we see it does not pass to the person in remainder. And it could never have been the intention to forfeit to him a slave to which his deed gave him no claim, present or future. *509 The law clearly contemplated such a remainder as carried the increase with it. It would lead to serious inconvenience to hold that such an interest as this amounted to a remainder within the terms of the act, as the grantor or his alienee would be entitled to the increase until the death of the grantor; if a forfeiture of the mother accrued before that event happened a serious question might arise as to the right to the increase thereafter. I think that the deed here did not create such a remainder as the law contemplated; and, therefore, the plaintiffs did not shew any title to the slave; and the motion for a new trial should have been sustained.
I also am of opinion, for the reasons given by Judge Baldwin, that the Court erred in permitting the answers to the interrogatories to be used as evidence against the defendants.
Brooke, J. concurred in the opinion of Allen, J.